JAQAY L. CARLYLE (SBN: 300979)
**PLUMMER CARLYLE WILLIAMS LLP**
1033 E. Imperial Highway, Suite E9
Brea, CA 92821
(424) 476-7249

*Attorney for DaJuanye Wingfield*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DaJuanye Wingfield<br><br>        Plaintiff,<br><br>    v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>        Defendant. | Case No. 2:25-cv-6875<br><br>**COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff DaJuanye "DJ" Wingfield ("Wingfield"), by and through his undersigned attorneys, by way of Complaint against defendant National Collegiate Athletic Association (the "NCAA"), hereby alleges as follows:

### SUMMARY OF THE ACTION

1. This is an action for immediate and permanent injunctive relief, compensatory and punitive damages, and attorneys' fees and costs to enjoin and redress the NCAA's enforcement against Wingfield, an athlete selected to join the University of Southern California ("USC") football team, of an unlawful eligibility rule that would prevent him from competing for USC in the 2025-2026 season in violation of federal antitrust laws.

2. The eligibility rule at issue is unlawful because it has substantial anticompetitive effects on two-year or junior colleges and universities that are excluded from NCAA membership.

1 – COMPLAINT

Under NCAA rules governing Division I colleges and universities, college athletes are only allowed to compete in intercollegiate sports for four (4) years within five (5) calendar years. This five-year period includes time spent at a two-year or junior college. The effect of this rule (the "Five-Year Rule") is to discourage college athletes from attending junior college to prepare for a four-year college and to punish those who do so, even though junior colleges may provide such college athletes with necessary academic and other opportunities. Just as the college athletes are deprived of the junior-college experience that may so benefit them, the junior colleges are deprived of elite athletes, reducing their ability to compete with NCAA schools.

3.   The effect of the NCAA's anticompetitive conduct is evident as it relates to Wingfield, an elite athlete who attended a junior college in 2019 to begin his collegiate career and faced significant disruptions due to the COVID-19 pandemic, which forced him to miss opportunities to compete. Under the circumstances, USC requested that the NCAA exercise its discretion to waive the Five-Year Rule as it applies to Wingfield, but the NCAA has refused to do so. Unless enjoined, the effect of the NCAA's anticompetitive conduct will be to penalize Wingfield for having attended a junior college and for the disruptions caused by the pandemic. It will also permanently deprive him of a once-in-a-lifetime name, image, and likeness ("NIL") contract that is worth approximately $210,000 when Wingfield was recruited to USC and the opportunity to enhance his career and reputation by playing another year of Division I football. The NCAA's anticompetitive conduct, coupled with its unreasonable denial of Wingfield's meritorious request for a waiver, thus threatens him with immediate irreparable harm.

4.   Because the NCAA's violation of federal antitrust law is so clear, Wingfield seeks to enjoin the NCAA from enforcing the Five-Year Rule as it applies to him while he pursues his antitrust claim in this action. Wingfield seeks a temporary injunction now because Division I football programs, including USC, began practicing in March, and such team practices are ongoing, and absent immediate injunctive relief, he will be prevented from participating in that critical preparation for the 2025-2026 season. Fall practices are set to begin, on or around July 30th, 2025, and the first game of the season is scheduled for August 30th, 2025.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over all claims at issue in this action pursuant to 28 USC §§ 1331, 1332, and 1367(a). The Court has federal-question jurisdiction over Wingfield's claim for violations of the Sherman Act.

6. This Court may exercise personal jurisdiction over the NCAA because it and its member institutions currently engage in continuous and systematic business in the Central District of California, including athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities, and have directed many of the specific acts alleged in the Complaint within this District.

7. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2)-(3) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because the NCAA is subject to personal jurisdiction in this District. Wingfield was offered and accepted an opportunity to enroll at USC and play football for the Trojans in the Big Ten Conference. USC is based in this District. This action arises in Los Angeles County because that is where a substantial part of the events that give rise to the claim occurred. Within Los Angeles County is found the University of Southern California campus. USC, for example, fields 23 Division I intercollegiate sports teams.

## THE PARTIES

8. Wingfield is a United State citizen who was selected by USC to play as a member of its football team in the 2025-2026 season.

9. NCAA is an unincorporated association headquartered in Indianapolis, Indiana, that serves as the governing body of college sports. It is, therefore, a citizen of the State of Indiana. NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Central District of California.

//
//
//

**FACTUAL ALLEGATIONS**

A.  <u>The Relevant NCAA Eligibility Rules And Their Discriminatory, Anticompetitive Effects On Junior Colleges.</u>

10. The NCAA is a voluntary, self-governing association of approximately 1,100 four-year colleges and universities that administers athletic competition for college athletes.

11. As the NCAA acknowledged in *NCAA v. Alston,* 594 U.S. 69, 90 (2021), its member schools collectively enjoy a monopoly in the market for college athlete services, such that it restraints can and do harm competition. With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually." *Johnson v. NCAA,* 108 F.4th 163, 170 (3d Cir. 2024).

12. Excluded from NCAA membership are two-year colleges ("Junior College(s)"), many of which are members of the National Junior College Athletic Association ("NJCAA"), an organization designed to promote, govern, and foster a competitive environment for two-year college athletics. The NJCAA has no affiliation with the NCAA.

13. The NCAA has three divisions: Division I, Division II, and Division III, each of which promulgates its own rules and operating guidelines. These rules include those that determine the eligibility of college athletes to participate in intercollegiate athletics.

14. As a general matter, Division I teams are the most popular and attract the most money and the most talented athletes. In the 4 years since *Alston*, the market for Name, Image, and Likeness ("NIL") Compensation has exploded, with the 2024 college football NIL market estimated at $1.1 billion.[1] Significantly, those NIL Compensation opportunities are virtually only available to NCAA Division I athletes. Only $6.5 million – less than six tenths of one percent (0.6%) of the $1.1 billion in football NIL compensation this year projects to go to non-NCAA Division I football players. In other words, athletes playing football outside of the NCAA monopoly have no meaningful opportunities to profit from their NIL as a result of this non-NCAA athletic participation.

---

[1] See NIL-AT-3- The Annual Opendorse Report p. 4)

15. Of relevance to this action are two eligibility rules codified in the Division I 2024-2025 Manual (the "Bylaws") that have the effect of discrimination against Junior Colleges by discouraging and penalizing college athletes who attend them.

16. The first is the Five-Year Rule. This rule forbids a college athlete from competing for a Division I school beyond the five years beginning when the student was first registered in a "collegiate institution." More specifically, the Bylaws provide, in pertinent part:

> **12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. . . .
> **12.8.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution . . . when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum fulltime program of studies, as determined by the institution, and attends the student's first day of classes for that term.

17. The second relevant rule of eligibility is the four-year limitation on intercollegiate competition (the "Intercollegiate Competition Rule"). Under this rule, a college athlete is forbidden from engaging "in more than four seasons of intercollegiate competition in any one sport." (Bylaws § 12.8.) Although Junior Colleges are excluded from Division I, the Bylaws define "intercollegiate competition" to include competition at either "a two-year or a four-year collegiate institution." (Bylaws § 12.02.6.) Unlike other football players who enroll directly at NCAA institutions and receive four seasons of eligibility and corresponding NIL earning potential, Junior College athletes are arbitrarily limited to only two or three seasons of NCAA Division I competition.

18. Notwithstanding these limitations, the NCAA maintains the discretion to waive the application of the Five-Year and Intercollegiate Competition Rules to enable college athletes to compete for NCAA member institutions.

19. The NCAA has provided blanket waivers of the Five-Year and Intercollegiate Competition Rules to institutions in light of certain events. One such blanket waiver was granted to institutions due to the COVID-19 pandemic. This waiver permitted institutions to self-apply a waiver of the Five-Year and Intercollegiate Competition Rules for the 2020-2021 season.

20. The NCAA also granted institutions a blanket waiver of the Intercollegiate Competition Rule in the wake of the decision of the United States District Court for the Middle District of Tennessee on December 18, 2024, in *Pavia v. NCAA,* 760 F.Supp.3d 527 (M.D. Tenn. Dec. 18, 2024).

21. In *Pavia,* the court granted Diego Pavia ("Pavia"), the quarterback for Vanderbilt University, a preliminary injunction prohibiting the NCAA from (a) counting a year that Pavia spent playing football at a Junior College as a season of competition for purposes of the Intercollegiate Competition Rule; and thereby (b) barring Pavia, who had otherwise played just three years of Division I college football, from playing for Vanderbilt in the 2025-2026 season.

22. The court found an injunction appropriate due to the clear anticompetitive effects the NCAA's interpretation of Intercollegiate Competition Rule—i.e., by counting Pavia's year of Junior College football as a season of competition —would have on Junior Colleges and college athletes:

> First, the challenged rules limit the NCAA Division I eligibility of student-athletes who attended junior college to two or three seasons while student-athletes who attend only NCAA Division I institutions have four years of Division I eligibility. This Rule gives a competitive advantage to NCAA Division I member schools over junior colleges—and thus the football players at each level—even though they are treated the same in terms of eligibility.
>
> The disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players by pushing student-athletes to attend NCAA member institutions so that they may enjoy a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically. Similarly, students who attend junior college for one year and are considering whether to continue their junior college education and obtain an associate degree or transfer to a NCAA Division I institution may be swayed in their decision by the prospect of relinquishing another year of NCAA eligibility

and the accompanying competitive advantages and NIL compensation. The rule requiring forfeit of NCAA eligibility and associated NIL opportunities for junior college attendance discounts that choice.

NCAA Division I member institutions compete directly with NJCAA schools or football talent. NCAA Division I offers a prospective football player significant advantages over junior college football—more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities disproportionately offered to Division I athletes.

In summary, the eligibility bylaws induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest. Therefore, the rule harms student athletes when they are making decisions on whether to attend a junior college or an NCAA institution.

23. On December 23, 2024, following the December 18, 2024 decision in *Pavia,* the NCAA provided a blanket waiver (the "*Pavia* Waiver") of the Intercollegiate Competition Rule to any college athlete who (i) competed for a Junior College; (ii) would have been eligible to compete in the 2025-2026 season but for their time competing for a Junior College; and (iii) met all other eligibility criteria.

24. But for the NCAA's interpretation and application of the Five-Year Rule to Wingfield, he would qualify for the *Pavia* Waiver.

B. Wingfield's Background And Collegiate Sporting Experience From 2019 Through The 2024-2025 Season.

25. Wingfield is a talented and highly sought-after football player. The relevant details of his college football career are provided below.

26. **2019-2020 Season.** Wingfield enrolled at a Junior College (El Camino College) for the 2019-2020 season and competed on its football team. This was his first year of competition, but such competition was not NCAA-sanctioned.

27. **2020-2021 Season.** Wingfield was not enrolled at El Camino College for the 2020-2021 season due to the COVID-19 pandemic. Wingfield was unable to compete and spent the

semester at home caring for his mother. He received a self-applied COVID-19 extension of eligibility waiver from the NCAA via the Committee on Student-Athlete Reinstatement Previously Approved List (PAL). Thus, this year does not count towards Wingfield's eligibility.

28.     **2021-2022 Season.** Wingfield competed at El Camino College. Wingfield was named to the Southern California Football Association ("SCFA") National Division Central League All-Second Team and was the No. 5 JUCO prospect in the state of California.

29.     **Spring 2022.** Wingfield transferred to University of New Mexico ("New Mexico"). Since football is a Fall sport, there was no competition during the Spring semester.

30.     **2022-2023 Season.** Wingfield suffered a torn ACL during the first game of the season; he then was granted a medical redshirt for the 2022-2023 season.

31.     **2023-2024 Season.** Wingfield continued at New Mexico and competed on its football team. Wingfield played nine games returning from his ACL injury. This was the first year Wingfield played NCAA Division I football.

32.     **Spring 2024.** Wingfield transferred to Purdue University ("Purdue"). Since football is a Fall sport, there was no competition during the Spring semester.

33.     **2024-25 Season.** Wingfield competed at Purdue. Wingfield appeared in and started all 12 games at right guard. He assisted Purdue to more than 200 rushing yards per game in consecutive games with 239 yards against Illinois (then ranked #23 nationally) and 208 yards vs Oregon (then ranked #2 nationally). This was only Wingfield's second year playing NCAA Division I football.

34.     **Spring 2025.** Wingfield transferred to USC, where he is currently enrolled. The ruling from the court in *Pavia* gave the USC coaches and Wingfield hope that he could play for another season. The expectation was that Fall 2025 would be an allowable year for Wingfield under the Intercollegiate Competition Rule.

35.     Despite the challenges posed by the COVID-19 pandemic and his ACL injury, Wingfield has excelled in his collegiate career, showcasing his talent and dedication to the sport.

//

//

  C. <u>Wingfield's Decision To Join USC, The NCAA's Denial Of USC's Request For A Waiver, And The Need For Immediate Injunctive Relief.</u>

36. Following his successful tenure at Purdue, Wingfield learned of the *Pavia* decision, and sought to continue his football career at a prestigious institution, entered the transfer portal, and received high interest from many institutions. He was offered and accepted an opportunity to enroll at USC and play football for the Trojans in the Big Ten Conference, one of the most prestigious conferences in the country.

37. Wingfield's decision to commit to and enroll at USC was based in part on an NIL contract that was offered to him worth approximately $210,000, a significant source of income for him and his family.

38. Shortly after extending this opportunity to Wingfield, USC requested that the NCAA waive enforcement of the Five-Year Rule, which would enable Wingfield to compete in the 2025-26 season. USC and Wingfield believed that Wingfield was eligible to play in the 2025 season as a result of the *Pavia* decision and *Pavia* Waiver and because Wingfield maintained eligibility under the Intercollegiate Competition Rule.

39. On March 26, 2025, the NCAA informed USC that its waiver request was denied, citing that Wingfield did not meet the criteria for an extension of eligibility.

40. Given the NCAA's refusal to grant Wingfield a waiver, he has filed this action to obtain injunctive relief from this Court. The need for such relief is urgent, as USC's fall practices are set to begin on or around July 30th, 2025, and the first game of the season is scheduled for August 30th, 2025. Without eligibility, Wingfield will be unable to participate, jeopardizing his position on the team and his future opportunities. These practices are critical and irreplaceable to both the team and Wingfield, as they would facilitate his integration into the Trojan's overall strategy and enable Wingfield to develop a rapport with the USC coaching staff and teammates.

D. <u>Relevant Markets.</u>

41. As the *Pavia* court found, the relevant market for purposes of this case is "the labor market for college football athletes in general and NCAA Division I football specifically." *Pavia*, 760 F.Supp.3d at *539.

42. The United States is the relevant geographic market, and the NCAA and its member institutions are located in that geographic market.

43. College athletes compete to earn spots on NCAA Division I athletic teams, and NCAA member institutions compete with other institutions to attract and secure top-level college athletes. NCAA member institutions secure college athletes through the provision of various in-kind benefits, including full and partial scholarships, advanced academic programming, access to state-of-the-art training and rehabilitation facilities, and premier instruction from knowledgeable coaching staff.

44. Participating in NCAA Division I athletics provides significant benefits and opportunities to college athletes, including: (1) the ability to maximize their chances to play professional sports by providing extensive exposure to scouts; (2) the opportunity to compete against the nation's best amateur athletes; (3) national publicity through nationwide broadcasting of sporting events; (4) full and partial scholarships; (5) the opportunity to earn personal sponsorship opportunities and marketing deals; (6) the ability to capitalize on NIL agreements, which sometimes provide millions of dollars in financial benefits; and (7) receipt of top-tier academic support through college athlete assistance programs.

45. The most talented college athletes have no practical alternatives in the relevant markets to participating in NCAA Division I athletics.

46. The NCAA has sole rule-making authority and maintains exclusive power over the promulgation of rules and regulations for its member institutions.

47. Though the NCAA is a non-profit organization, its member institutions reap significant financial gains through the transactions they make with college athletes. Member institutions reap revenue through hosting athletic events on their campuses, merchandise sales, television broadcasting contracts, and the generation of interest in their institutions. In return, the college athletes receive the many benefits enumerated above.

48. Accordingly, the transactions between member institutions and college athletes are inherently commercial and fall within the purview of the Sherman Act.

//

E.     Anti-competitive Effects.

49.     The NCAA enacts and enforces rules that it claims promote fairness and the well-being of college athletes while preserving true athletic amateurism. These rules are adopted through the NCAA Division I Council and member institutions, effectively making the rules the practical equivalent of horizontal agreements among the NCAA and the member institutions that compete against one another for the labor of college athletes.

50.     The NCAA's refusal to grant Wingfield the requested waiver has direct anticompetitive effects that harm junior colleges, college athletes, and consumers of college athletics.

51.     By including time spent at junior colleges in the Five-Year Rule, the NCAA discourages college athletes from attending junior colleges, thereby harming the ability of junior colleges to compete with NCAA schools for talented athletes. More specifically, as the court in *Pavia* found, enforcing NCAA rules that discourage or penalize college athletes from attending Junior Colleges harms the Junior Colleges' ability to compete with Division I schools for talented athletes and limits the choice of educational institutions available to college athletes.

52.     Additionally, the NCAA's failure to adequately account for the disruptions caused by the COVID-19 pandemic, such as the cancellation of the 2020-21 season, further restricts college athletes' eligibility and opportunities.

53.     Consumers of Division I intercollegiate events are also harmed, as the competitiveness of teams is reduced due to restrictions on elite athletes who attended Junior Colleges or faced pandemic-related disruptions.

F.     The NCAA's Rule of Restitution.

54.     The NCAA's Rule of Restitution (Bylaw § 12.11.4.2) allows the NCAA to punish a college athlete and the member school he or she attends (as well as the college athlete's teammates) if the college athlete and the school rely on a court-issued temporary restraining order ("TRO") or preliminary injunction enjoining unlawful conduct by the NCAA and mandating that the college athlete be permitted to participate in athletic competition if the TRO or injunction is later revoked for any reason.

55. The clear purpose and effect of the Rule of Restitution is to discourage challenges to the NCAA's anticompetitive and improper rules and rulings by making it impossible for college athletes and member schools to rely on validly entered court orders and to obtain meaningful injunctive relief. Indeed, in light of the Rule of Restitution, colleges and universities typically do not permit a college athlete to participate in athletic competition even if he or she obtains a TRO or preliminary injunction finding that an NCAA ruling is likely invalid and enjoining the NCAA from enforcing that unlawful restraint.

56. As a result, courts, including this one, have enjoined the NCAA from enforcing the Rule of Restitution against college athletes and their respective institutions who rely on a temporary restraining order or preliminary injunction when participating in intercollegiate athletics. *See Elad v. NCAA*, No. 25-cv-1981, 2025 WL 1202014, at *11 (D.N.J. Apr. 25, 2025); *Williams v. NCAA*, No. 24-cv-614, 2024 WL 397760, at *4 (D.N.J. Feb. 2, 2024); *Pavia*, 760 F.Supp.3d at 545; *Ohio v. NCAA*, 706 F. Supp. 3d 583, 601-02 (N.D.W.V. 2023).

G. <u>The Irreparable Harm To Wingfield.</u>

57. Wingfield will suffer substantial irreparable harm if the Court does not grant the requested injunctive relief requested in this action, which would enable him to immediately join a Division I program and continue his promising football career during the 2025-2026 season, including the loss of his opportunity to play for USC, his NIL contract of $210,000 and his chance to advance his football career for professional opportunities. As held in *Elad*. "[a] loss of [an athlete's] NIL agreement if he is unable to play this season can be quantified, but his lost opportunity to play a year of Division I football is incalculable in terms of personal experience. This season [] is a chance for [him] to build memories and lasting relationships both on and off the field." *See Elad v. NCAA,* No. 25-cv-1981, 2025 WL 1202014, at *17 (D.N.J. Apr. 25, 2025).

58. By contrast, if the Court does not grant Wingfield the requested injunctive relief, he will be unable to play for USC in its 2025-26 season. He will thus be denied the opportunity those games present to gain the attention and acclaim that can only be obtained playing for a Division I football team in one of college football's most prestigious and widely covered conferences, to take advantage of his NIL deal, and to increase his chances of earning a contract

to play professional football following the 2025-26 season. Missing out on these opportunities is the very definition of irreparable harm, as this Court recently recognized. *Elad v. NCAA*, No. 25-cv-1981, 2025 WL 1202014, at *9-10 (D.N.J. Apr. 25, 2025); *Williams v. NCAA*, No. 24-cv-614, 2024 WL 397760, at *3 (D.N.J. Feb. 2, 2024).

59. Wingfield has already lost an opportunity to practice with USC, and, unless he is assured that he will be eligible to play during the 2025-2026 season, Wingfield will continue to lose this opportunity to practice with the team. These missed practices have and will continue to harm Wingfield irreparably, as it has and will deprive him of critical and irreplaceable opportunities to become integrated into the USC scheme and team as a whole. The first game of the 2025-2026 season is August 30th, 2025. Further, the more days that pass, the more likely that USC will sign another player at his position (offensive lineman) to fill his roster spot; in that event, Wingfield will lose the opportunity to play Division I college football this coming season, regardless of how his eligibility status is ultimately resolved.

60. Despite the obvious and immediate harm that Wingfield will suffer if not granted the requested relief, the NCAA has refused to grant him a waiver of the Five-Year Rule (and thus also refused to grant him the *Pavia* Waiver, which is dependent on the waiver of the Five-Year Rule). The NCAA has done so—confusingly and inconsistently—even though it granted the *Pavia* Waiver on a blanket basis for purposes of the Intercollegiate Competition Rule. This Court's immediate intervention is needed to right this wrong.

H. Balance of the Equities:

61. As set forth above, Wingfield is "likely to suffer substantial, immediate, and irreparable harm should he be prevented from playing this season. The NCAA, by contrast, would suffer little harm insofar as, should they later succeed on the merits, they can terminate [Wingfield's] eligibility" See *Elad*. ("Court finds that the balance of the equities weighs heavily in Elad's favor."). This Court's immediate intervention is needed to right this wrong.

I. Public Interest.

63. There is a compelling public interest in promoting fair competition and equal opportunities for all college athletes, regardless of division or sport. The NCAA's discriminatory

eligibility rules and waiver procedure not only impact Division I football but also reverberate across all divisions (II and III) and sports, disproportionately harming student athletes seeking to transfer for better opportunities. These rules degrade the quality of competition available to both the public and student bodies and ultimately impair the integrity of college athletics. The ripple impacts extend to the professional level, impacting the NFL Draft and hindering athletes' ability to benefit from NIL opportunities, thereby restricting their livelihood and long-term career prospects. Inconsistent application of the Five-Year Rule by the NCAA will leave future student-athletes at a disadvantage in this district and across the country. In order to prevent illegal antitrust acts, "free and fair competition in the labor markets is essential to the American economy." *Elad*; *Williams* at *3.

## COUNT ONE – VIOLATION OF §1 OF THE SHERMAN ACT

64. Wingfield repeats and realleges the allegations contained in Paragraphs 1 through 63 of this Complaint as though fully set forth herein.

65. The NCAA, by and through its officers, directors, employees, agents, or other representatives, has illegally restrained and suppressed competition in the relevant markets through its refusal to waive the Five-Year Rule as it applies to Wingfield's time attending a Junior College and facing pandemic disruptions. The threat posed by the NCAA having license to bar college athletes from realizing the opportunities they have earned without logical justification stifles the market's ability to flourish.

66. As a direct result of the NCAA's denial of Wingfield's waiver request, the NCAA will establish a precedent that it may unreasonably restrict college athletes' ability to participate in the relevant labor market. Thus, restricting their ability to compete and earn lucrative amounts of money through NIL.

67. The NCAA's position results in no benefits to competition in Division I collegiate athletics for the NCAA's member institutions, college athletes, or consumers of NCAA athletic contests. Indeed, the NCAA's position is logically inconsistent with its own decision to grant college athletes a blanket waiver in these circumstances for purposes of the Intercollegiate Competition Rule.

68. The NCAA's anticompetitive acts were intentionally directed at the United States market and have had a substantial and foreseeable effect on interstate commerce.

### COUNT TWO - BREACH OF CONTRACT

69. Wingfield repeats and realleges the allegations contained in Paragraphs 1 through 68 of this Complaint as though fully set forth herein.

70. USC is a member of the NCAA Division I. As such, USC has agreed to submit to and abide by the NCAA's rules and regulations in exchange for the benefits of NCAA membership, such as participation in high-level intercollegiate athletic competitions. Furthermore, USC has agreed to subject itself to NCAA discipline for any failure to comply with its rules and regulations.

71. Wingfield, as a student-athlete enrolled at USC who is subject to the same NCAA rules and regulations, is an intended third-party beneficiary of the contractual relationship between USC and the NCAA.

72. The NCAA has a contractual obligation to Wingfield, as an intended third-party beneficiary, to enforce its rules and regulations fairly, consistently and reasonably.

73. As detailed above, the NCAA will not deem Wingfield eligible for the 2025-26 Division I college football season based on its unreasonable and arbitrary application of the Five-Year Rule and its rule counting Junior College competition as intercollegiate competition, even though the recent ruling in *Pavia* makes clear that this application violates the Sherman Act and is thus unlawful and invalid.

74. The NCAA is treating the Five-Year Rule, when coupled with the rule counting Junior College competition as intercollegiate competition, as valid and enforceable but the *Pavia* ruling makes clear that it is not. As a result, the NCAA's insistence that the time Wingfield spent playing football at a Junior College counts as intercollegiate competition for purposes of the Five-Year Rule is directly contrary to its promise to enforce and adjudicate its rules fairly.

75. By refusing to deem Wingfield eligible for the 2025-26 Division I college football season based on the Five-Year Rule, the NCAA has breached its contractual obligations to him because there is no NCAA rule or regulation in existence that authorizes or permits those actions.

76. As an intended third-party beneficiary of UCLA's agreement to be bound by the NCAA rules and regulations, Wingfield has suffered and continues to suffer substantial and irreparable harm as a result the NCAA's denial of his eligibility to participate in athletics without any valid contractual authority. To unjustly prevent Wingfield from playing football during the 2025-26 season deprives him of the once-in-a-lifetime opportunity to compete in Division I football games, improve his skills, support his teammates, and showcase his talents to future professional employers. Specifically, Plaintiff will be unable to compete in athletic competition and avail himself of the myriad opportunities that emanate from his participation, including lucrative NIL rights.

## COUNT THREE - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

77. Wingfield repeats and realleges the allegations contained in Paragraphs 1 through 76 of this Complaint as though fully set forth herein.

78. There is a covenant of good faith and fair dealing implied in every contract, including the contract between the NCAA and USC to which Wingfield is an intended third-party beneficiary. That covenant imposes on the parties an obligation to treat one another reasonably and fairly, and to not do anything to destroy or injure one another's right to receive the fruits of the contract.

79. As detailed above, the NCAA has treated Wingfield unreasonably and unfairly, and has destroyed and injured his contractual rights, by counting the season Wingfield spent playing football at a Junior College as intercollegiate competition for purposes of the Five- Year Rule and thereby deeming him ineligible to play in the 2025-2026 season. The NCAA has engaged in this conduct for the improper purpose and ill motive of enforcing its application of the Five-Year Rule, which the *Pavia* decision makes clear is a violation of the Sherman Act.

80. The NCAA has, therefore, breached the implied covenant of good faith and fair dealing.

81. As a direct and proximate result of the NCAA's breach of the implied covenant of good faith and fair dealing, Wingfield has suffered and will continue to suffer significant damages.

**PRAYER FOR RELIEF**

WHEREFORE, Wingfield respectfully requests Judgment in his favor and against the NCAA as follows:

A.  Declaring that (i) the NCAA's application of the Five-Year Rule to include time spent at Junior Colleges violates the Sherman Act; and (ii) Wingfield is eligible to play for USC during the 2025-2026 season;

B.  Preliminarily and permanently enjoining the NCAA from enforcing the Five-Year Rule against Wingfield;

C.  Preliminarily and permanently enjoining the NCAA from enforcing the Rule of Restitution against Wingfield and USC for complying with any injunctive order entered by this Court;

D.  Awarding Wingfield compensatory and punitive damages, attorneys' fees and costs, prejudgment and post-judgment interest, and such other further relief as the Court may deem equitable and just and proper.

Date:  July 25, 2025                                **Plummer, Carlyle, Williams, LLP**

                                                           /s/JaQay L. Carlyle
                                                           JaQay L. Carlyle
                                                           *Attorney for DaJuanye Wingfield*

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1, Plaintiff hereby demands a trial by jury.

Date: July 25, 2025                                **Plummer, Carlyle, Williams, LLP**
                                                                                                    /s/JaQay L. Carlyle
                                                                                                       JaQay L. Carlyle
                                                                    *Attorney for DaJuanye Wingfield*

## DECLARATION OF ELECTRONIC SERVICE

**Central District of California Case No. 2:25-cv-6875**

Service of the attached document was accomplished pursuant to Central District of California, Order Authorizing Electronic Filing, General Order No. 08-03 and Local Rule 5.3-3, which provide in part: "Upon the electronic filing of a document, a Notice of Electronic Filing (NEF) is automatically generated by the CM/ECF system and sent by e-mail to all attorneys in the case who are registered as CM/ECF Users and have consented to electronic service. Service by this electronic NEF constitutes service pursuant to the Federal Rules of Civil and Criminal Procedure for all attorneys who have consented to electronic service."

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on July 25, 2025 at Brea, California.

By: /s/  JaQay L. Carlyle
        JaQay L. Carlyle